**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **BONNIE S. BROWN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:05-CV-0071-BH** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent Case** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pursuant to the District Court's *Order of Reassignment*, filed July 19, 2005, this case has been transferred to this Court for all further proceedings. Before the Court are the *Brief for Plaintiff*, filed September 26, 2005, and *Defendant's Brief and Response to Plaintiff's Brief*, filed November 21, 2005. Plaintiff did not file a reply. Having reviewed the evidence of the parties in connection with the pleadings, the Court finds that the final decision of the Commissioner should be **AFFIRMED**.

## I. BACKGROUND[1]

### A.    Procedural History

Bonnie S. Brown ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security (the "Commissioner") denying her claim for disability benefits under Title XVI of the Social Security Act. On March 12, 2002, Plaintiff filed an application for disability payments. (Tr. at 14). Plaintiff claimed disability since December 21, 1998, due to depression, mood disorders,

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr." The Court notes that pages 219-233 pertain to a different claimant and appear to have been included in Plaintiff's transcript in error.

asthma, a seizure disorder, and migraine headaches. (Tr. at 16.) Plaintiff's application was denied initially and upon reconsideration. (Tr. at 14.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 41.) A hearing, at which Plaintiff personally appeared and testified, was held on April 13, 2004. (Tr. at 373-415.) On September 24, 2004, the ALJ issued her decision finding Plaintiff not disabled. (Tr. at 11-25.) The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 4-6.) Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 4.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on April 6, 2005.

## B.    Factual History

### 1.  Age, Education, and Work Experience

Plaintiff's date of birth is August 23, 1961. (Tr. at 60.) Plaintiff completed her GED in 1979 and has not completed any type of special job training, trade, or vocational school. (Tr. at 76.) Plaintiff previously worked as a groundskeeper, laborer of toys and sports equipment, survey worker, child monitor, housekeeper, car hop, pocket maker, and roofer's helper. (Tr. at 407-08.)

### 2.  Medical Evidence

On May 9, 2000,[2] Plaintiff sought help for depression from the Helen Farabee Regional Mental Health and Mental Retardation Center in Wichita Falls, Texas (hereinafter, "Helen Farabee Center"). (Tr. at 261-63.) Ruth Kizer, LPC, recorded Plaintiff's social history and conducted a clinical assessment. *Id*. Ms. Kizer recommended that Plaintiff's case be opened for service

---

[2]Plaintiff claims a disability onset date of December 21, 1998, but May 9, 2000, is the date of the earliest medical record relevant to her alleged disability. (Tr. at 261-63; *cf*. Tr. at 16, 386-87.) The earliest medical record in the transcript is Plaintiff's February 23, 2000 visit to an eye doctor. (Tr. at 303-05.)

coordination at the Helen Farabee Center.  (Tr. at 263.)

Plaintiff returned to the Helen Farabee Center on June 5, 2000, for a psychiatric evaluation by Dr. A. V. Nanjundasamy, M.D.  Plaintiff reported a difficult childhood and feeling depressed all her life. (Tr. at 258.)  Plaintiff stated that she began smoking cigarettes when she was five years old and currently smokes one pack a day.  (Tr. at 259.)  Plaintiff experimented with speed and marijuana in the past but never used alcohol.  *Id*.  Dr. Nanjundasamy diagnosed Plaintiff with "major depressive disorder, recurrent, severe, without psychotic features." (Tr. at 260.)  Based on Plaintiff's personal account of bronchial asthma since childhood and a seizure disorder since 1994, Dr. Nanjundasamy also diagnosed Plaintiff with these two afflictions.  (Tr. at 259-60.)  Dr. Nanjundasamy noted that Plaintiff suffers from occupational and economic problems and problems related to the social environment.  *Id*.  To alleviate the symptoms of Plaintiff's long-term depression, Dr. Nanjundasamy prescribed Celexa and Elavil (amitriptyline).  *Id*.  Medical records from Plaintiff's subsequent appointments at the Helen Farabee Center over the next year and a half note an improvement in her mental condition, although symptoms of depression persisted and were accompanied by an increase in irritability and mood swings.  (*See e.g.*, Tr. at 234, 239, 243, 248, 250, 255.)  Plaintiff began taking Depakote for her migraines; the Depakote had the added benefit of helping to control Plaintiff's mood swings and irritability.  (Tr. at 239.)

On December 15, 2000, Plaintiff began to receive treatment for her asthma and seizure disorder from Dr. Nasrin Samidoost, M.D., of the Wichita Falls Family Practice clinic.  (Tr. at 126-27.)  Previously, she received care from a different provider.  (Tr. at 127.)  Dr. Samidoost continued Plaintiff's medications of Dilantin for her seizure disorder, and Vanceril, Serevent, and albuterol for her asthma. (Tr. at 126.)  Dr. Samidoost planned to see Plaintiff in March of 2001, but she returned

on January 30, 2001, due to an exacerbation of her asthma. (Tr. at 125.) Dr. Samidoost sent Plaintiff to the emergency room to get a breathing treatment of albuterol via a nebulizer, and approximately three weeks later, he noted that she was "doing better." (Tr. at 124-25.) Plaintiff saw Dr. Samidoost every two to three months for refills of her medication. (Tr. at 116-23.) On December 6, 2001, Dr. Samidoost noted that Plaintiff had not had an asthma attack for three months and that "overall she [was] doing okay." (Tr. at 118.) Dr. Samidoost changed Plaintiff's asthma inhaler prescriptions twice over the next two visits, and he noted on March 7, 2002, the date of her last recorded visit with him, that Plaintiff was on Advair and albuterol and had "no complaints" of her asthma condition. (Tr. at 116-17.) Plaintiff remained on Dilantin for her seizure disorder throughout her treatment by Dr. Samidoost. (*See* Tr. at 116-27.)

On May 1, 2002, Dr. James Ireland, M.D., a psychiatrist at the Helen Farabee Center, examined Plaintiff. He noted that she "has not been doing well" and experienced significant mood swings and irritability. (Tr. at 206-08.) Dr. Ireland stated that Plaintiff has a lot of stress in her family and that she has been getting very angry with people who are perceived as a threat to her son. He also indicated that Plaintiff understands this reaction is an excessive response and that she was alert and cooperative during the examination. Dr. Ireland increased Plaintiff's dosage of Depakote to help her deal with her mood swings and irritability. (Tr. at 206.)

On June 26, 2002, Plaintiff saw Dr. Danny Bartel, M.D., a neurologist at North Texas Neurology Associates in Wichita Falls. (Tr. at 166-68.) Dr. Samidoost referred Plaintiff to Dr. Bartel for a neurological assessment of her seizure disorder. (Tr. at 166.) Dr. Bartel indicated that Plaintiff's affect was appropriate and her mood was normal. (Tr. at 167.) He also noted that Plaintiff's thought processes were goal-directed, her concentration span and memory skills were

intact, and her judgment and insight were good. *Id*. Dr. Bartel's impression was that Plaintiff suffered from a seizure disorder, chronic asthma, and chronic migraine headaches. *Id*. Dr. Bartel ordered nerve conduction velocity tests of the upper and lower extremities and an MRI of the brain and lumbar spine; all of the tests were normal with three minor exceptions: a slight auditory delay on the right; an old, small left lacunar infarct in the brain; and mild clumping of the nerve roots in the spine. (Tr. at 169-80.) Dr. Bartel and the examining radiologist noted that the studies were negative. (Tr. at 169-72.)

On July 10, 2002, Dr. A. Boulos, M.D., a non-examining state agency consultant, conducted a psychiatric review of Plaintiff's medical records. (Tr. at 138-55.) Dr. Boulos noted that Plaintiff experienced a mild degree of limitation in her daily living activities and a moderate degree of limitation in social functioning and in maintaining concentration, persistence, or pace. (Tr. at 148.) Dr. Boulos wrote that Plaintiff's "alleged limitations due to mental symptoms are not fully supported" by the evidence on record. (Tr. at 150.) He further noted that Plaintiff had an above average level of functioning and that her symptoms had partially responded to her prescribed medication. (Tr. at 151.) Dr. Boulos elaborated that Plaintiff "retains the abilities to understand and carry out simple instructions, to interact with coworkers and supervisors, and to adapt to routine changes in the work setting." (Tr. at 154.) Dr. Boulos's assessment of Plaintiff's mental functional capacity was affirmed by a second consultant. (*See* Tr. at 151, 154.)

Plaintiff returned to the Helen Farabee Center on July 24, 2002. Dr. Ireland noted that Plaintiff tolerated her medications well and did not have any side effects. (Tr. at 204.) He did note, however, that Plaintiff experienced some problems falling down but that she was taking extra precautions. *Id*. Dr. Ireland stated that Plaintiff "appears to be doing well." *Id*. Plaintiff continued

to receive counseling for coping skills and stress management. (Tr. at 185-95.) For the next three months, Plaintiff was fine until shortly before her next appointment at the Helen Farabee Center on October 24, 2002. (Tr. at 341.) Plaintiff told her counselor, John Wilson, that her son's recent release from jail induced daily crying spells and anger directed towards her son. *Id*. Mr. Wilson noted that other than anger towards her son, Plaintiff did not have severe mood swings. *Id*.

On March 19, 2003, Plaintiff was admitted to the United Regional Health Care System in Wichita Falls for shortness of breath. (Tr. at 334.) She was seen by Dr. Sadaf Anwar, M.D., who ordered a pulmonary function test. *Id*. The tests indicated that Plaintiff had a moderate restrictive and mild obstructive defect, a result consistent with asthma. (Tr. at 336.)

On June 5, 2003, Dr. Anwar completed a "Physicians's Statement" form from the Department of Health and Human Services ("DHHS") as part of Plaintiff's application for disability benefits. (Tr. at 184.) Although Dr. Anwar indicated that Plaintiff was unable to work, he also wrote that the disability was not permanent but was expected to last more than six months. *Id*. Dr. Anwar noted that Plaintiff was able to sit for a maximum of two hours per day and that she could not lift more than twenty pounds for two hours per day. *Id*. He also noted that despite her limitations, Plaintiff could complete community work in an office environment with little physical strain and that she could be assigned to employment activities in a classroom setting. *Id*.

Plaintiff returned to the Helen Farabee Center on August 29, 2003, and was examined by Arleta Brown, R.N., M.S., FNP-C. (Tr. at 340.) Nurse Brown, a licensed nurse practitioner, noted that Plaintiff was "behaviorally stable" and that her "major depressive symptoms are partially controlled on the Celexa." *Id*. Nurse Brown also indicated that Plaintiff experienced some family stress due to her daughter and granddaughter moving in with her. *Id*. Because Plaintiff complained

of general unhappiness with the Depakote and associated weight gain, Nurse Brown recommended switching Plaintiff to Topamax to treat Plaintiff's migraine headaches. *Id.*

On January 12, 2004, Plaintiff was admitted to the emergency room at United Regional Health Care System on a complaint of chest pain. (Tr. at 306.) Dr. Chandrakala Rudraraju, M.D., diagnosed Plaintiff with an acute myocardial infarction. (Tr. at 309.) Plaintiff underwent emergency cardiac catheterization and angioplasty. *Id.*

Approximately six months later, Nurse Brown at the Helen Farabee Center completed two assessments of Plaintiff's mental capacity. The first, dated June 15, 2004, was a "Physician's Statement" from DHHS. (Tr. at 353-54.) This form indicated that Plaintiff's "major depression, recurrent, severe" was a permanent condition but did not provide any details on Plaintiff's drug regimen or activity restrictions. *Id.* The second "Mental Medical Source Statement," dated August 24, 2004, provided more detailed information on Plaintiff's condition. Nurse Brown noted that Plaintiff had a moderate limitation in the following areas: maintaining a schedule, working with others without being distracted, accepting instructions and criticism, being aware of normal hazards and taking appropriate precautions, and setting realistic goals. (Tr. at 369-70.) The assessment defined a "moderate limitation" as something that "affects but does not preclude ability to perform basic work functions." (Tr. at 368.) Nurse Brown noted that Plaintiff has a marked limitation in the following areas: completing a normal workday without interruptions, getting along with others without distracting them with behavioral extremes, maintaining socially appropriate behavior and hygiene, responding appropriately to changes in the work setting, and traveling to unfamiliar places or using public transportation. The assessment defined a "marked limitation" as something that "seriously affects ability to perform basic work functions." (Tr. at 368.) Nurse Brown did not

indicate that Plaintiff had a "severe limitation" for any category. (*See* Tr. at 368-70.) She restated Plaintiff's diagnosis of "major depression, recurrent, severe, no psychosis," and indicated that this was a marked health impairment. (Tr. at 371.) Nurse Brown also determined that Plaintiff was capable of managing monetary benefits in her best interest. *Id*.

### 3. Hearing Testimony

A hearing was held before the ALJ on April 13, 2004. (Tr. at 372.) Plaintiff appeared personally and was represented by a non-attorney representative. *Id.*

### a. Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that she was born on August 23, 1961, and that she was not married. (Tr. at 375.) She lived with someone by the name of Eric Garcia; none of her adult children lived with her. (Tr. at 375-76.) Plaintiff completed her GED but had not had any vocational training. (Tr. at 376.)

Under examination by the ALJ, Plaintiff recounted the numerous jobs she held over the past several years. She testified that she last worked for one day in April 1998 as a groundskeeper; she left this position because she believed it was too difficult for a woman to perform. (Tr. at 376-77.) Prior to her work as a groundskeeper, Plaintiff worked full-time for four months attaching buckles to life jackets for Texas Recreation. (Tr. at 377.) Plaintiff left this position because she became angry with a co-worker. *Id*. Plaintiff also planted flowers for a greenhouse for one season and assisted a roofing crew until she sustained an unspecified injury. (Tr. at 377-78.) Prior to her work with the roofers, Plaintiff provided full-time child care to a handicapped child for a year and a half until the family moved out of state. (Tr. at 378-79.) Plaintiff also worked as a maid for Motel 6 for one to two months but quit because she could not get along with the manager and did not like the

work. (Tr. at 379.) Plaintiff worked for six years gathering information for City Directory, a company associated with the Census; she left this position because the company ceased publishing books. *Id.* Plaintiff infrequently worked as a car hop at a local drive-in until the business closed. (Tr. at 379-80.) Plaintiff also sewed pockets and zippers for Levi-Strauss until she "kind of went blind staring too much." (Tr. at 380.) Finally, Plaintiff stated that she assisted her former husband with mowing and roofing. (Tr. at 381; *see* Tr. at 375.)

Plaintiff reported supporting herself through boyfriends and receiving temporary assistance for needy families (TANIF) for her medication and food stamps. (Tr. at 383.) She spent her time "just trying to make it," and since her heart attack in January 2004, she had been trying to exercise more. (Tr. at 383.) Plaintiff stated that she did not have any hobbies or social activities, but she performed housework, such as dusting, vacuuming, and laundry. (Tr. at 383-86.) The furthest she had been from her home in the three years was to a casino in Oklahoma. (Tr. at 384-85.) Plaintiff last babysat her granddaughter four months before the hearing. (Tr. at 385.) She did not see her three sons unless she visited them in jail, and she did not see her three other grandchildren, family, or friends unless they visited her at her home. *Id.*

After recounting how she supported herself and spent her time, Plaintiff testified about her medical condition. She said that on December 21, 1998, her alleged disability onset date, she had a stroke and a seizure. (Tr. at 386.) The stroke impaired mobility in the left side of her body for approximately three months. (Tr. at 387.) Plaintiff said that she suffered four to five seizures a week, but with a change of medication to Topamax in December 2003, her seizures were completely under control. (Tr. at 388.) In January 2004, Plaintiff said she underwent angioplasty after a heart attack, and she claimed to still suffer from chest pain three to four times a week, typically when she

exerted herself.  (Tr. at 389-90.)  Plaintiff said she took nitroglycerin for her chest pain and Zocor and Plavix for her high blood pressure.  (Tr. at 390-91.)  Plaintiff stated that her use of nitroglycerin prevented her from taking her asthma medication whenever she needed it.  (Tr. at 392.)  Because of her heart condition, Plaintiff said her doctor (she did not specify which) took her off the nebulizer used to treat her asthma, although she still used an inhaler.  (Tr. at 392-93.)  Plaintiff mentioned that she had difficulty urinating but that Dr. Anwar told her this was normal.  (Tr. at 403.)  She admitted to weekly marijuana use prior to her heart attack but denied ever using any other illegal drug or alcohol.  (Tr. at 404-05.)  At the time of the hearing, Plaintiff estimated that she smoked approximately six cigarettes a day.  (Tr. at 405.)

Plaintiff also testified that she suffered from sleeplessness and major depression.  Symptoms of her depression included staying in her room all day, frequent crying spells, violent outbursts, sleeping with butcher knives, suicidal thoughts, and a lack of desire to maintain personal hygiene and grooming.  (Tr. at 394-98.)  Plaintiff believed that her depression was getting worse, due in large part to her other medical problems.  (Tr. at 398.)  Plaintiff cited her depression as the main problem preventing her from being able to maintain employment and stated that anger stemming from her depression was the reason her employment ended at some of her jobs.  (Tr. at 399-400.)

### b. *Vocational Expert's Testimony*

Once Plaintiff completed her testimony, the ALJ examined a vocational expert ("VE").  The VE testified that Plaintiff's work history included: (1) groundskeeper (medium, unskilled, SVP of two); (2) laborer, toys and sports equipment (either light or medium, unskilled, SVP of two); (3) survey worker (light, unskilled, SVP of two); (4) child monitor (medium to heavy, low-level semiskilled, SVP of three); (5) maid/housekeeper (light, unskilled, SVP of two); (6) car hop (light,

unskilled, SVP of two); (7) pocket maker (light, SVP of four); (8) roofer helper (medium, unskilled, SVP of two).  (Tr. at 407-08.)

The ALJ asked the VE if a hypothetical individual would be able to perform the past job of "laborer, sports and toys" if the individual was of the same age and educational experience as the Plaintiff; unable to work at unprotected heights or around hazards; unable to balance or climb ladders, ropes, or scaffolds; unable to work in a concentrated exposure to dust or chemicals; limited to only occasional stooping and crouching; and unable to work with the public.  (Tr. at 408-09.)  The VE answered that such a person would not be able to work as a laborer of sports and toys but that the individual would be able to work as: (1) an assembler of plastic hospital products (light, unskilled, SVP of two with 1,000 jobs in the regional and 25,000 jobs in the national economy); (2) a laundry folder (light, unskilled, SVP of two with 2,500 jobs in the regional and 40,000 jobs in the national economy); (3) a marker (light, unskilled, SVP of two with 3,000 jobs in the regional and 50,000 jobs in the national economy); or (4) an electronics worker (light, unskilled, SVP of two with 4,000 to 5,000 jobs in the regional and 100,000 jobs in the national economy).  (Tr. at 409.)

The ALJ then asked if any of the hypothetical person's ability to do any of the four occupations identified by the VE would be changed if the individual was capable of lifting or carrying a maximum of 40 pounds, 20 pounds on a frequent basis; unable to work in concentrated exposures to dust, chemicals, and smoke; unable to work with the public; and unable to work in temperature extremes.  (Tr. at 409-10.)  The VE responded that none of the four occupations previously listed would be precluded under the new hypothetical.  (Tr. at 411.)

In response to hypothetical questions from Plaintiff's representative, VE stated that the hypothetical individual in question would not be able to perform any of the four listed occupations

if the individual either: (1) missed work an average of two days a week because of seizures; (2) became very angry, distracted other employees, and had confrontations with supervisors on a regular basis, affecting the work of the other employees; (3) had to take unscheduled rest breaks of at least fifteen minutes, three to four times per week because of chest pains; or (4) had to take unscheduled ten-minute breaks three to four times a day to take nebulizing treatments for her asthma and breathing problems.  (Tr. at 411-13.)

## C.     ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on September 24, 2004.  (Tr. at 11-25.)  The ALJ determined that the evidence was insufficient to find that Plaintiff had engaged in substantial gainful activity at any time relevant to her decision.  (Tr. at 24, ¶1.)  In addition, she found that Plaintiff has severe asthma; seizures; obesity; a major depressive disorder, recurrent, without psychotic features; drug (speed and marijuana) and alcohol dependence; a history of left infarct; occlusion of the left anterior descending artery in January 2004; and a history of a fracture of the left fifth metatarsal.  (Tr. at 24, ¶2.)  The ALJ found that Plaintiff did not have an impairment or combination of impairments listed in Appendix 1.  (Tr. at 16, ¶2.)  The ALJ determined that Plaintiff's allegations and testimony were not entirely credible, considering the reports to examiners, the findings on examination, medical reports, the extent of treatment needed, and the claimant's daily activities.  (Tr. at 24, ¶4.)

The ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") for a range of light work with the following limitations: lift/carry forty pounds, twenty pounds on a frequent basis; unable to work at unprotected heights or around hazards; unable to balance or climb ladders, ropes, or scaffolds; stoop or crouch occasionally; unable to work in concentrated exposure

to dust, heat, smoke, and chemicals; unable to work in temperature extremes; and unable to work with the public. (Tr. at 24, ¶¶5, 11.) The ALJ determined that Plaintiff was unable to perform her past relevant work as a laborer of sports and toys. (Tr. at 24, ¶6.) The ALJ found Plaintiff to be an unskilled younger individual with the RFC to perform a range of light work. (Tr. at 24, ¶¶7, 9, 10.) The ALJ then considered Plaintiff's RFC, age, education, and work experience and concluded that the Rule 202.20 of the medical-vocational guidelines directed a finding of not disabled. (Tr. at 24, ¶11.) The ALJ found a significant number of jobs in the national economy that Plaintiff could perform with her RFC. (Tr. at 25, ¶12.) Examples of such occupations are an assembler of hospital products, a laundry folder, and an electronics worker. (Tr. at 25, ¶12.) Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined by the Social Security Act, at any time through the date of her decision. (Tr. at 25, ¶13.)

## II. ANALYSIS

### A.     Legal Standards

#### 1.  Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the

record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the SSI program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for SSI. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be

-14-

disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      Issue for Review**

Plaintiff presents a single issue for review: "[w]hether Defendant's (i.e., the Administrative Law Judge's) finding as to Plaintiff's residual functional capacity is supported by substantial evidence and/or results from reversible legal error." (Pl. Br. at 1.) Plaintiff contends that the ALJ erred in her determination of both Plaintiff's mental and physical RFC.

Social Security regulations provide that "[o]rdinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Id*. "RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting." *Id*. at *2 (emphasis in the original). The RFC is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988).

In the instant case, the ALJ found that Plaintiff's "allegations of limitations resulting in her ability to perform work activity are not supported by credible facts and findings." (Tr. at 21; 24, ¶4.) The ALJ determined, based on credible evidence in the record, that Plaintiff retained the mental and physical RFC to perform a range of light work. (Tr. at 24, ¶10.)

### 1. Mental RFC

Plaintiff alleges that substantial evidence does not support the ALJ's determination of Plaintiff's mental RFC because the ALJ found that Plaintiff's only mental limitation was that she could not work with the public. (Pl. Br. at 16.) Plaintiff contends that the ALJ improperly considered the findings of Nurse Brown and Dr. Boulos in her assessment of Plaintiff's mental RFC.

### a. Nurse Brown

Plaintiff alleges that the ALJ summarily discounted Nurse Brown's August 24, 2004 "Mental Medical Source Statement." (Pl. Br. at 16.) Nurse Brown, a licensed nurse practitioner, noted that Plaintiff had "moderate" to "marked" limitations in ten areas relating to Plaintiff's ability to sustain activity in a normal workday and workweek on an ongoing basis. (*See* Tr. at 368-71.) Despite these limitations identified by Nurse Brown, the ALJ determined that Nurse Brown's statement was "not a true medical opinion, since it was completed by a nurse. It appears to have been completed according to the claimant's statements of her limitations. It is given minimal credence, except as consistent with the medical reports and the residual functional capacity." (Tr. at 22.) Plaintiff asserts that the treatment of Nurse Brown's statement was improper because the ALJ said the statement was not a medical opinion and it was completed according to Plaintiff's account of her own limitations. (Pl. Br. at 16-18.)

Social Security regulations provide that nurse practitioners, such as Nurse Brown, are appropriate medical sources that may be considered in assessing the severity of a claimant's impairment. *See* 20 C.F.R. § 416.913(d)(1)(2005). Plaintiff is therefore correct in identifying Nurse Brown's statement as an acceptable medical source. However, the ALJ is not required to consider an assessment by a licensed nurse practitioner because the Social Security regulations clearly state that "*in addition to* evidence from acceptable medical sources listed in paragraph (a), [the Commissioner] *may* also use evidence from other sources," including nurse practitioners. 20 C.F.R. § 416.913(d) (emphasis added). Thus, although Nurse Brown is an acceptable medical source for determining Plaintiff's mental RFC, the consideration of the assessment was at the discretion of the ALJ because it came from a nurse practitioner and was in addition to evidence from medical sources

listed in 20 C.F.R. § 416.913(a).

Moreover, the ALJ did not say that she would not consider the statement at all, but rather, that it deserved "minimal credence except as consistent with the medical reports and the residual functional capacity." (Tr. at 22.) A review of the medical record shows that Nurse Brown's determination of Plaintiff's mental RFC is inconsistent with substantial evidence in the record. In the event of an evidentiary conflict, the ALJ has the responsibility to determine which evidence is credible and how it will be weighed. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983). On July 10, 2002, Dr. Boulos, a non-examining state agency consultant, noted that Plaintiff "retains the abilities to understand and carry out simple instructions, to interact with coworkers and supervisors, and to adapt to routine changes in the work setting." (Tr. at 22, 154.) Dr. Boulos found that Plaintiff's overall functioning was above average, and he noted that her "alleged limitations due to mental symptoms are not fully supported" by the evidence on the record. (Tr. at 150-51.) Dr. Boulos based his determination of Plaintiff's mental RFC on a review of Plaintiff's medical records; a second consultant also reviewed the medical records and concurred in Dr. Boulos's assessment. (*See* Tr. at 151, 154.) Dr. Boulos's findings provide substantial evidence that Plaintiff retains the mental RFC to perform a range of light work.

Other medical evidence in the record provides additional support for the ALJ's decision to discount Nurse Brown's assessment of Plaintiff's mental RFC. Examples that Plaintiff's depression was not as limiting as alleged include: (1) Dr. Nanjundasamy's August 27, 2001 notation that Plaintiff was doing "much, much better" under treatment with Celexa and Elavil (Tr. at 243); (2) the positive response of Plaintiff's mood swings and irritability to Depakote (*see* Tr. at 206, 239); (3) Dr. Bartel's June 26, 2002 neurological assessment that found Plaintiff's thought processes were

goal-directed, her concentration span and memory skills were intact, her judgment and insight were good, and her thought content was devoid of delusions or hallucinations; and (4) Dr. Ireland's July 24, 2002 finding that Plaintiff "appears to be doing well." (Tr. at 204.) Furthermore, Nurse Brown herself found on August 29, 2003 that Plaintiff was "behaviorally stable" and that her "major depressive symptoms are partially controlled on the Celexa." (Tr. at 340.) The notations of several doctors and Nurse Brown indicate that Plaintiff's depression is under control with prescribed medication and that it is not a disabling mental condition that prevents Plaintiff from engaging in a range of light work. Although the ALJ does not provide any explanation for her conclusion that Nurse Brown's statement was completed according to Plaintiff's own account of her limitations, the substantial evidence in the record that conflicts with Plaintiff's alleged limitations provides support.

The ALJ's decision to accord Nurse Brown's August 24, 2004 statement little weight is supported by substantial evidence in the record. *Leggett*, 67 F.3d at 564. Thus, the ALJ committed no error when she discounted the weight accorded to Nurse Brown's mental medical source statement of Plaintiff's mental RFC.

### b. Dr. Boulos

Plaintiff next contends that the ALJ erred in assessing Plaintiff's mental RFC because she did not address the inherent contradictions in Dr. Boulos's psychiatric review of Plaintiff's records. (Def. Br. at 19.) Dr. Boulos, a non-examining state agency consultant, noted that Plaintiff experienced a mild degree of limitation in her daily living activities and a moderate degree of limitation in social functioning and in maintaining concentration, persistence, or pace. (Tr. at 148.) Despite these identified limitations, Dr. Boulos concluded that Plaintiff "retains the abilities to understand and carry out simple instructions, to interact with coworkers and supervisors, and to

adapt to routine changes in the work setting." (Tr. at 22, 154.) Plaintiff contends that by relying on

Dr. Boulos's conclusions and failing to address the previously determined limitations, the ALJ

violated SSR 96-8p and selectively considered evidence that supported her position.[3] (Def. Br. at

19.)

> Social Security Regulation 96-8p provides that
>
> [t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)...The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7. Plaintiff contends that because the ALJ did not address Dr.

Boulos's finding that Plaintiff experienced mild or moderate limitations in some daily activities, she

violated SSR 96-8p. (*See* Def. Br. at 19.) The Court first notes that Dr. Boulos did not say that

Plaintiff was unable to interact with co-workers and supervisors, but only that she was moderately

limited in this activity. Second, the findings of Plaintiff's mild to moderate limitations were not

material since Dr. Boulos himself ultimately concluded that Plaintiff retained "the abilities to

understand and carry out simple instructions, to interact with coworkers and supervisors, and to

adapt to routine changes in the work setting." (Tr. at 148, 154.) Third, the ALJ did include a

narrative discussion of Plaintiff's mental RFC as required by SSR 96-8p. (*See* Tr. at 22; 24, ¶5.)

The ALJ's written opinion states that she considered all relevant medical evidence in determining

Plaintiff's mental RFC, (Tr. at 21-22), and the record reflects that she did not "pick and choose

among evidence and consider only that which supports her position" as Plaintiff contends. (Pl. Br.

---

[3]The ALJ stated that she considered Dr. Boulos's opinion in accordance with SSR 96-6p, which requires the ALJ to consider the opinions of State agency medical consultants insofar as they are supported by evidence in the record. (Tr. at 22; *see* SSR 96-6p, 1996 WL 374180, at *3-4 (S.S.A. July 2, 1996)).

at 19) (citing *Loza v. Apfel*, 219 F.3d 378, 393-94 (5th Cir. 2000)). The ALJ therefore did not violate SSR 96-8p by failing to address the internal inconsistencies in Dr. Boulos's opinion of Plaintiff's mental RFC.

Even if the internal consistencies in Dr. Boulos's examination are material, which the Court finds they are not, the ALJ's failure to specifically address Plaintiff's mild to moderate limitations as identified by Dr. Boulos resulted in harmless error. Where substantial evidence supports the ALJ's decision, "the failure to consider every single opinion or statement of an SAMC ["state agency medical consultant"] in an administrative decision that otherwise discusses the findings of said SAMC may...constitute harmless error." *Alejandro v. Barnhart*, 291 F.Supp.2d 497, 516-17 (S.D. Tex. 2003) (citing *Mitchell v. Barnhart*, 2003 WL 1565467, at *1 (4th Cir. Mar. 27, 2003) (per curiam); *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985); *Mirza v. Barnhart*, 2003 WL 21058542, at *4 n.3 (N.D. Ill. May 9, 2003)). Even where the record demonstrates procedural improprieties, a court will not remand unless the substantial rights of a party have been affected. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). Remand is appropriate only if the improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision. *Id*.

In this case, it is notable that in explaining and elaborating on his findings, Dr. Boulos stated that "claimant retains the abilities to understand and carry out simple instructions, to interact with coworkers and supervisors, and to adapt to routine changes in the work setting." (Tr. at 154.) He also stated that Plaintiff's "alleged limitations due to mental symptoms are not fully supported" by the evidence on record. (Tr. at 150.) He further noted that Plaintiff has an above average level of functioning and that her symptoms have partially responded to her prescribed medication. (Tr. at

151.)  Additionally, although Plaintiff asserts that she should have been found disabled due to limitations on her ability to interact with co-workers and supervisors, she fails to point to any other evidence in the record supporting such a limitation.  (*See* Pl. Br. at 19.)

For these reasons, the Court concludes that even if the ALJ's failure to address each limitation set forth by Dr. Boulos was erroneous, which the Court finds that it was not, such error was harmless because substantial evidence supports the ALJ's decision to rely on Dr. Boulos's conclusion that Plaintiff retained the mental RFC to perform a range of light work.

### 2.  *Physical RFC*

Plaintiff also alleges that substantial evidence does not support the ALJ's finding that Plaintiff retains the physical RFC to perform a range of light work.  (Pl. Br. at 1.)  Specifically, Plaintiff objects to two aspects of the ALJ's finding: (1) the ALJ found that Plaintiff could lift and/or carry a maximum of forty pounds, twenty pounds on a frequent basis; and (2) the ALJ failed to address Plaintiff's ability to sit for an extended period.  (Pl. Br. at 20; *see* Tr. at 24, ¶5.)  Plaintiff contends that the ALJ's physical RFC assessment conflicts with Dr. Anwar's June 5, 2003 physician's statement imposing a lift/carry restriction of twenty pounds for no more than two hours per day and a sitting restriction of two hours per day.  (Pl. Br. at 20-21; *see* Tr. at 184.)

The Court first considers whether Dr. Anwar is a "treating source" as defined by the Social Security regulations such that his opinion should be given controlling weight as required by 20 C.F.R. § 404.1502.  A "treating source" is a physician who has provided medical treatment or evaluation to a plaintiff and had an "ongoing treatment relationship" with the plaintiff.  20 C.F.R. § 404.1502.  A treatment relationship is generally considered ongoing when the medical evidence establishes that the claimant has seen "the source with a frequency consistent with accepted medical

practice for the type of treatment and/or evaluation required for your medical conditions." *Id.* The Commissioner "may consider an acceptable medical source who has treated or evaluated [the plaintiff] only a few times or only after long intervals (e.g., twice a year) to be [a] treating source if the nature and frequency of the treatment or evaluation is typical for [the plaintiff's] condition(s)." *Id.* The regulations distinguish infrequent but medically appropriate treatment from situations in which the "relationship with the source is not based on [the] medical need for treatment or evaluation, but solely on [the] need to obtain a report in support of [a] claim for disability." *Id.* After reviewing the evidence, the Court finds that Dr. Anwar is not a "treating source" within the meaning of 20 C.F.R § 404.1502. Plaintiff saw Dr. Anwar on only two occasions: once in the emergency room on March 19, 2003, for shortness of breath and a second time on June 5, 2003, for an assessment of her physical restrictions in support of her claim for disability. (Tr. at 184, 334.) Since Plaintiff does not have an ongoing treatment relationship with Dr. Anwar, he is not a treating source physician as defined by 20 C.F.R. § 404.1502. His assessment of Plaintiff's physical limitations therefore is not accorded controlling weight as required by 20 C.F.R. § 404.1527(d)(2).

Since Dr. Anwar's determination of Plaintiff's physical RFC is not given controlling weight, the Court must determine whether substantial evidence in the record supports the ALJ's determination that Plaintiff retains the physical RFC to perform a range of light work. *Greenspan*, 38 F.3d at 236. The Fifth Circuit explicitly rejects rigid rules of articulation and has held that the ALJ does not have to specifically discuss all evidence that supports the decision or all the evidence that was rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994.) Rather, the ALJ is bound to explain the reason for her decision. *Id.* The conflicting evidence provided by Dr. Anwar's statement must be weighed and assessed by the ALJ in accordance with other substantial evidence in the

record. *See Patton*, 697 F.2d at 592.

In this case, the ALJ explained that Plaintiff's alleged limitations on her ability to work were not supported by credible facts and findings from the medical record or from the hearing testimony. (Tr. at 21-22.) Plaintiff's sole support for her lifting and sitting restrictions is Dr. Anwar's statement, but as explained earlier, this statement is not accorded controlling weight. The Court has not found, nor does Plaintiff cite to, any restriction from a treating source regarding Plaintiff's physical capabilities. Moreover, Plaintiff's testimony regarding her daily activities provides substantial evidence that she retains the physical RFC to perform a range of light work. *Leggett*, 67 F.3d at 565, n. 12 (daily activities are appropriately considered in evaluating a claimant's disability status). Plaintiff testified that she had been trying to exercise to improve her heart's health after her heart attack in January 2004. (Tr. at 383.) Plaintiff also testified that she performed housework such as dusting, vacuuming, and laundry on a regular basis. (Tr. at 21, 384.) Dr. Anwar's statement conflicts with other substantial evidence in the record, but it is the purview of the ALJ, not of the Court, to determine which evidence is credible and how it will be weighed. *Patton*, 697 F.2d at 592. Based on the absence of physical restrictions from treating sources and Plaintiff's own account of what she can still do, the Court finds that substantial evidence in the record supports the ALJ's determination that Plaintiff retains the physical RFC to perform a range of light work.[4]

_____

[4]Plaintiff cites to *Schwabe v. Barnhart* in support of her assertion that the ALJ's determination of Plaintiff's physical RFC is not supported by substantial evidence. (Pl. Br. at 21) (citing 338 F.Supp.2d 941, 952 (E.D. Wis. 2004).) In *Schwabe*, the court found that the ALJ's determination of the claimant's RFC was inconsistent with restrictions imposed by the claimant's treating and examining physicians. 338 F.Supp. 29 at 952. *Schwabe* is distinguishable from the instant case because Plaintiff has not submitted any physical restriction from a treating physician. Furthermore, substantial evidence from Plaintiff's daily activities supports the ALJ's determination that Plaintiff retains the physical RFC to perform a range of light work.

In a parenthetical, Plaintiff appears to raise an additional issue that was not presented as a separate issue for review as required by this Court's scheduling order. Plaintiff argues that the ALJ committed error by not distinguishing among the light work jobs which primarily require sitting and those which primarily require standing/walking in light of Dr. Anwar's sitting restriction. (Pl. Br. at 21.) Since Dr. Anwar is not a treating physician as defined by 20 C.F.R. 404.1502, his opinion on the amount of time Plaintiff can sit is not controlling.

## III. CONCLUSION

For the foregoing reasons, the Court determines that the ALJ properly assessed Plaintiff's

mental and physical RFC.  The final decision of the Commissioner is hereby **AFFIRMED**.

**SO ORDERED** this 28th day of July, 2007.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

The Court therefore need not determine the amount of time a laborer spends sitting while performing the jobs identified by the VE.